UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| WORKSHOPS PORTLAND CARSON, L.L.C., a Washington limited liability company, | Case No. 3:15-cv-01234-AC |
| Plaintiff, | OPINION AND ORDER |
| v. | |
| CARSON OIL CO., INC., an Oregon corporation, | |
| Defendant. | |

ACOSTA, United States Magistrate Judge:

Plaintiff Workshops Portland Carson, L.L.C. ("Workshops"), brings a claim for breach of commercial lease against Defendant Carson Oil Co., Inc. ("Carson"), to recover damages related to holdover rent and environmental remediation. Carson brings counterclaims for breach of the implied covenant of good faith and fair dealing, and promissory estoppel. Workshops moves for partial summary judgment as to both counterclaims.

The court held oral argument on February 28, 2017.    For the following reasons, Workshops' motion for partial summary judgment as to breach of the implied covenant of good faith and fair dealing (ECF No. 30) is denied, and Workshops' motion for partial summary judgment as to promissory estoppel (ECF No. 35) is granted.

*Background*

Workshops is a Washington limited liability company managed by ActivSpace, LLC. Compl. (ECF No. 1) ¶ 3; Zahniser Dec. (ECF No. 31), Ex. 1, p. 11, 91:5–7.  ActivSpace runs facilities that artisans, small builders, and contractors may rent work space to conduct business activities.  Zahniser Dec., Ex. 1, p. 3, 7:10–16.  Carson is an Oregon corporation that operates a petroleum distribution business in the Portland area.  Compl. ¶ 4; Zahniser Dec., Ex. 2, p. 6, 61:3–20.  The property at issue ("the Premises") encompasses the entire city block located at SE Eighth Avenue and SE Main Street in Portland.  Zahniser Dec., Ex. 1, p. 3, 8:12–17.

Beginning in 1980, Carson operated a cardlock station on the Premises and dispensed petroleum products to customers and employees.  Am. Answer to Compl. (ECF No. 29) ¶ 23; Zahniser Dec., Ex. 2, p. 6, 61:3–20.  In February 1998, Workshops purchased the Premises.  Am. Answer to Compl. ¶ 25.  As a part of the sale, Workshops leased back to Carson approximately 12,000 square feet of the property to retain existing petroleum products storage and dispensing facilities.  Zahniser Dec., Ex. 2, p. 8, 67:3–9.  The remaining portion of the Premises was developed into an ActivSpace facility.  Zahniser Dec., Ex. 1, pp. 8–9, 53:16–54:9.

Carson's rent payment under the 1998 lease started at $3,500 per month, and annual increases were tied to the consumer price index.  Zahniser Dec., Ex. 3, p. 1.  The lease was for a ten-year term and granted two five-year options for Carson to extend the initial term.  Zahniser Dec., Ex. 3, pp. 1, 8.  In late 2007, Carson elected to exercise the first five-year option, extending

the term to 2013. Zahniser Decl., Ex. 2, p. 9, 70:7–71:5. In 2013, however, Carson did not

timely notify Workshops of its intent to exercise the second five-year option, and the lease

terminated. Zahniser Dec., Ex. 2, 71:20–72:20. By March 31, 2013, Carson had become a

holdover tenant on a month-to-month lease term. Zahniser Dec., Ex. 3, p. 4. Carson wanted to

remain an occupant at the facility for a longer period of time, and after unsuccessfully trying to

exercise the second five-year option, the parties entered into negotiations that resulted in the

lease at issue in this case. Sramek Dec (ECF No. 34), Ex. A, pp. 8–10; Zahniser Dec., Ex. 2, p.

9, 73:1–23.

In May 10, 2013, Workshops sent Carson a draft lease, effective April 1, 2013, for a one-

year term that would expire March 31, 2014. Sramek Dec., Ex. B. The lease included a rental

rate of $4,750.43 per month. Sramek Dec., Ex. B, p. 3. The draft did not contain an option for

Carson to extend the lease beyond the one-year term, and on May 15, 2013, Carson requested

that two five-year options be included in the lease. Sramek Dec., Ex. C. In September 2013,

Workshops added one five-year option ("the Option") as "Exhibit C" to the draft lease, which

reads:

> To Commercial Lease Between Workshops Portland Carson, LLC ("Landlord")
> and Carson Oil Company, Inc. ("Tenant")
>
> Option to Extend:
>
> Provided that Tenant is not in default of the Lease, Tenant shall have one (1)
> option to extend the Term of the lease for one (1) period of five (5) years (the
> "Option Period") commencing at the end of the initial one (1) year term. All
> terms and conditions of the original Lease shall remain unchanged with the
> exception of rent.
>
> Tenant may exercise this option by notifying Landlord of its intent in writing no
> later than 90 days prior to the expiration of the initial one (1) year term. Within
> thirty (30) days after Landlord receives Tenant's written notice of intent, Landlord
> shall provide Tenant with the rental structure for the Option Period. If Landlord
> and Tenant are unable to agree upon the rental structure by the 60th day after

Landlord receives Tenant's written notice of intent, this option shall expire and will then be deemed null and void.

Zahniser Decl., Ex. 4, p. 22.

On October 3, 2013, after reviewing the Option, Carson emailed Workshops and asked how rent would be determined. Zahniser Dec., Ex. 11, p. 2. Workshops responded by email:

The landlord will submit to Carson its proposed rental structure after receiving notice of intent to exercise. The structure will be based upon the Premises' market value. Like we've said all along, the immediate renewal period of 12 months is at the previous rental rate inflated by 3%. The rental rate was not based on any market study or current market rents. We will embark upon a comprehensive and objective valuation of the property and premises so that if Carson does exercise its option to extend, we will be able to present a rental structure that accurately represents the true market value of the premises.

Zahniser Dec., Ex. 11, p. 1–2. Shortly after, Carson signed the lease. Zahniser Dec., Ex. 11, p. 1.

On December 16, 2013, Carson sent notice of its intent to exercise the Option. Sramek Dec., Ex. E. On January 10, 2014, Workshops forwarded a proposed rent of $18,000 per month. Sramek Dec., Ex. F, p. 2. On January 24, 2014, Carson responded with a proposal of $5,000 per month. Zahniser Dec., Ex. 6. As negotiations continued, Workshops conferred with two outside consultants to help determine fair market rent for the Premises. The first consultant was Petroleum Realty Advisors, who recommended Carson's rent start at $5,000 per month. Sramek Dec., Ex. H, p. 18. The second consultant was Kidder Matthews, who recommended Carson's rent start at approximately $4,125. Sramek Dec., Ex. I, p. 1; Ex. K, p. 26:1–7.

On March 31, 2014, the last day of the lease term, Workshops' acting broker and agent circulated a proposal that would have extended the lease on a month-to-month basis to facilitate continuing negotiations. Sramek Dec., Ex. J. Workshops, however, did not agree to the proposal. Sramek Dec., Ex. J, p. 2. As a result, the 2013 lease expired. Zahniser Dec., Ex. 4, p. 22.

On April 4, 2014, Workshops informed Carson that it was in holdover status and would continue to be until it vacated the Premises and completed its environmental obligations pursuant to the 2013 lease. Zahniser Dec., Ex. 7. On April 15, 2014, Carson advised Workshops it was in the process of complying with the termination provisions and, on April 18, would cease operations and begin remediation. Zahniser Dec., Ex. 8. Carson completed remediation on February 17, 2015. Zahniser Dec., Ex. 12.

Workshops filed this action on July 2, 2015, seeking damages totaling $300,825.74, which includes costs of holdover rent, late fees and prorated taxes during the holdover period, internal staff time, attorney fees, and remediation. Compl. ¶ 14. Carson initially responded with a counterclaim that Workshops violated the implied covenant of good faith and fair dealing inherent in the 2013 lease. Answer to Compl. (ECF No. 5) ¶ 40. Carson later amended its answer to include a counterclaim for promissory estoppel. Am. Answer to Compl. ¶ 44–47. Workshops now moves for partial summary judgment as to both counterclaims.

## Legal Standard

A court should grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no issue of fact exists and that the nonmovant cannot prove one or more essential elements of a claim or defense. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). If the movant meets his burden, the nonmovant must "go beyond the pleadings [] by her own affidavits . . . [to] designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotation marks omitted). On summary judgment, the court is bound to view all facts in a light most favorable to

the nonmovant and must draw all justifiable inferences in the nonmovant's favor. *Narayan v. EGI, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010).

*Analysis*

I.  Implied Covenant of Good Faith and Fair Dealing.

Workshops moves for partial summary judgment on the issue of whether it breached the implied covenant of good faith and fair dealing inherent in the 2013 lease. Workshops contends the Option is not an enforceable contract upon which a duty can be imposed, the duty owed under the 2013 lease was limited to offering the opportunity to negotiate an extension, and Workshops was allowed unfettered discretion in proposing a rental rate. Carson argues that Workshops was obligated to exercise this discretion consistent with the parties' objectively reasonable expectations, and determining whether this obligation was met is a fact-specific analysis not appropriate for summary judgment. The court agrees with Carson and denies Workshops' motion.

*A.  Exhibit C.*

The court first considers whether the Option is part of the 2013 lease. Workshops correctly recognizes that, standing alone, the Option is unenforceable because it does not provide a certain and definite rate of rent. *See Karamanos v. Hamm*, 267 Or. 1, 5 (1973) ("[T]he rule that the agreement must provide a rate of rent with a degree of certainty and definiteness or with some means or mode for determination of the rent rate applies equally in a provision for an extension of the lease as well as in an option for an extension of the lease."). Further, the 2013 lease did not specifically include the Option as part of the lease itself. *See* Zahniser Dec., Ex. 4, p. 13, Sec. 16.4.

However, under Oregon law, "[o]ne document need not expressly incorporate the other by reference if the connection between them is unmistakable[.]" *McInnis v. Lind*, 198 Or. App. 139, 149 (2005). "Oregon courts have identified three factors that, when present together, demonstrate that multiple documents should be construed as a single contract: (1) the documents are made by the same parties, *Hays v. Hug*, 243 Or. 175, 177 (1966); (2) the documents are executed at or about the same time, *id.*; and (3) the documents are part of the same transaction, *id.*; *First Interstate Bank of Oregon, N.A. v. Morris*, 120 Or. App. 46, 48 (1993)." *Arnett v. Bank of America, N.A.*, 874 F. Supp. 2d 1021, 1030 (D. Or. 2012). Here, the Option and 2013 lease satisfy all three factors. Therefore, the implied covenant of good faith and fair dealing applies both to the 2013 lease and the Option.

   *B.  Application to Exhibit C.*

The implied covenant of good faith and fair dealing is a well-recognized part of Oregon common law. *Best v. U.S. Nat'l Bank of Oregon*, 303 Or. 557, 561 (1987). The duty requires that parties to a contract not act in a way that destroys or injures the rights of the other, *Perkins v. Standard Oil Co.*, 235 Or. 7, 16 (1963), or that frustrates or defeats the object of the contract. *Warnock v. Bonneville Gen. Agency, Inc.*, 271 Or. 634, 639 (1975). The contractual good faith doctrine "emphasizes faithfulness to an agreed common purpose" and is designed to "effectuate the reasonable contractual expectations of the parties." *Best*, 303 Or. at 562–63 (citations omitted). But, "it is only the objectively reasonable expectations of parties that will be examined in determining whether the obligation of good faith has been met." *Tolbert v. First Nat'l Bank of Oregon*, 312 Or. 485, 494 (1991) (footnote omitted). "The obligation of good faith does not vary the substantive terms of the bargain . . . , nor does it provide a remedy for an unpleasantly

motivated act that is expressly permitted by contract . . ." *U.S. Nat'l Bank of Oregon v. Boge*, 311 Or. 550, 567 (1995).

In *Arnett v. Bank of America, N.A.*, the court reviewed the development of the implied covenant of good faith and fair dealing under Oregon law in instances where the contract gives a party discretion. *See* 874 F. Supp. 2d at 1033–35 (collecting cases). In Oregon cases where "a contract expressly provides for a unilateral exercise of discretion, the duty of good faith cannot circumscribe that discretion." *Id.* at 1034; *see Pac. First Bank v. New Morgan Park Corp.*, 319 Or. 342, 354 (1994) (finding the "terms demonstrate that the parties agreed to — that is, reasonably expected — a unilateral, unrestricted exercise of discretion"); *Uptown Heights Assoc. Ltd. P'ship v. Seafirst Corp.*, 320 Or. 638, 647–48 (1995) ("the reasonable contractual expectations of the parties are shown[] by the unambiguous terms of the contract"). Notwithstanding that general principle, "when a contract provides for discretion, but does not provide for a method of exercising that discretion, the duty of good faith and fair dealing may still apply." *Arnett*, 874 F. Supp. 2d at 1034; *see Best*, 303 Or. at 562–63.

In *Best*, a bank had the contractual discretion to set fees, but the contract contained no method of setting the fee. *Best*, 303 Or. at 561–62. The court found that the good-faith doctrine limited this contractual discretion. *Id.* at 563.   Courts seek to "effectuate the reasonable contractual expectations of the parties" through the good-faith doctrine. *Id.* (citations omitted). "When one party to a contract is given discretion . . . the parties ordinarily contemplate that discretion will be exercised for particular purposes." *Id.*   Exercise of that discretion for a purpose the parties did not contemplate is contrary to the good-faith doctrine. *Id.*

The court finds that, similar to *Best*, the Option here does not provide any method by which Workshops could arrive at a proposed rental structure.  Workshops equates this absence of

method with unfettered discretion, but its interpretation conflicts with *Best*'s rule and is not supported by those cases where a contract *expressly provides* for unilateral discretion. *See Uptown Heights*, 320 Or. at 647 (distinguishing itself from *Best* "because in that summary judgment case that bank had the discretion to fill in an open price term, and no method of setting the . . . fee was spelled out in the depositors' contracts . . . [b]y contrast, in this case, there was a specific agreement"). Instead, as *Best* instructs, Workshops' rent structure should have been consistent with Carson's reasonable expectations, and whether it did so is a question of fact. 303 Or. at 565–66. Here, evidence indicates that Workshops set a rental structure more than three times the rent the parties historically agreed to and three times greater than its hired consultants had recommended throughout the negotiations. The facts further showed that Workshops never moved from its initial $18,000 proposal and made no attempt to continue negotiations at the end of the 60-day period, although its own broker proposed to do so. Viewing this evidence in a light most favorable to Carson, it can be reasonably inferred that Workshops' actions were inconsistent with the reasonable expectations of both parties. Therefore, summary judgment is inappropriate and Workshops' motion is denied.

II. Promissory Estoppel.

Workshops also moves for partial summary judgment on the issue of whether its October 2013 email, in which it explained how it would calculate a proposed rental structure, can constitute promissory estoppel. Workshops argues it did not breach any promise to Carson, Carson cannot have reasonably and foreseeably relied on Workshop's indefinite promise to value its property in any specific manner, and that Carson did not materially change its position. Carson argues that a jury could conclude all elements of promissory estoppel are met. The court agrees with Workshops and grants its motion.

"[P]romissory estoppel is not a 'cause of action' in itself, but is a subset of and a theory of recovery in breach of contract actions." *Neiss v. Ehlers*, 135 Or. App. 218, 227–28 (1995) (citations omitted).  The elements of a claim for promissory estoppel are: "(1) a promise (2) which the promisor, as a reasonable person, could foresee would induce conduct of the kind which occurred, (3) actual reliance on the promise, (4) resulting in a substantial change in position." *Id.* at 223 (quoting *Bixler v. First National Bank*, 49 Or. App. 195, 199–200 (1980)).

As a threshold matter, Workshops argues that the October 2013 email cannot be considered for a promissory estoppel claim under the parol evidence rule.  Under Oregon law, "[a] completely integrated writing may not be contradicted or supplemented by prior terms . . . [s]tated more specifically . . . parol evidence of prior agreements within the scope of the complete integration is inadmissible, whether or not that evidence is consistent with the complete integration." *Abercrombie v. Hayden Corp.*, 320 Or. 279, 288 (1994) (citation omitted).  Here, the 2013 lease contains an express integration clause stating there are "no oral or other agreements, including, but not limited to, any representations or warranties, that modify or affect this Lease . . . [and the] Lease embodies the entire agreement between the parties and supersedes all prior agreements and understandings, if any, relating to the Premises." Zahniser Dec., Ex. 3, p. 15.

The court concludes that the parol evidence rule bars consideration of the October 2013 email.  The authorities Workshops cites are not binding on this court, and indeed, there is relatively little guidance on the issue.  *See George Hammersmith, Inc. v. Taco Bell Corp.*, 942 F.2d 791, No. 90-35460, 1991 WL 159466, at *6 (9th Cir. 1991) (unpublished) (holding parol evidence rule barred promissory estoppel claim); *Chang v. Kamehameha Sch./Bernice Pauahi Bishop Estate*, 81 Fed. Appx. 685, 688, No. 02-15568, 2003 WL 22805168 (9th Cir. 2003)

(unpublished) (same); *Slemp v. Transamerica Ins. Co.*, CIV. No. 87-1354-FR, 1989 WL 35871, at *5 (D. Or. Apr. 12, 1989) (same). *Slemp*, however, is analogous to this present case and is persuasive.

In *Slemp*, a corporation entered into a general agency agreement with an insurance company, and the agreement provided it "shall terminate . . . upon either party giving not less than 90 days written notice to the other." 1989 WL 35871, at *1. The insurance company notified the corporation of termination, and the corporation sued alleging the termination was wrongful and in bad faith. *Id.* The corporation brought a claim for promissory estoppel, alleging that prior to entering the agreement, the insurance company represented that it would not enforce the termination provision if the corporation carried out the agreement in a reasonable and diligent manner. *Id.* at *4. In granting summary judgment for the insurance company and concluding the corporation could not bring a claim of promissory estoppel based upon parol evidence, the court provided the following reasoning:

> The doctrine of promissory estoppel was adopted because the requisites of a contract between the parties did not exist. After all, there would be no need for the doctrine if an action for breach or specific performance of a contact could be brought. The rationale for the doctrine simply disappears when the parties finally enter into a contract. If the doctrine can be applied as an alternative to a breach of contract action which is barred by the parol evidence rule, then the parol evidence rule would be nugatory . . . the purpose of the rule is to bind the parties to the agreement that they executed in writing.

*Id.* at *5 (quoting *Durkee v. Goodyear Tire & Rubber Co.*, 676 F. Supp. 189, 191–92 (D. Wis. 1987)).

In lieu of precedent on the matter, the court concludes the same rationale should apply here. As in *Slemp*, the parties have a fully integrated written agreement. *Id.* at *1. The prior representations in *Slemp* contradicted the written agreement in that case, similar to the email Carson relies on here. *Id.* at *5. The parol evidence rule would bar a breach of contract action

based on the extrinsic evidence Carson relies on for the basis of its promissory estoppel claim. *Id.* at \*4–5. Promissory estoppel does not allow Carson to evade the parol evidence rule. Therefore, summary judgment is appropriate and Workshops' motion is granted.

*Conclusion*

Workshops' motion for partial summary judgment (# 30) on Carson's counterclaim of breach of the implied covenant of good faith and fair dealing is denied. Workshops' motion for partial summary judgment (# 35) on Carson's counterclaim of promissory estoppel is granted.

IT IS SO ORDERED.

DATED this 24th day of March, 2017.

John V. Acosta
U.S. Magistrate Judge